**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| UNITED STATES OF AMERICA | CRIMINAL ACTION |
|---|---|
| v. | NO. 20-00270 |
| PETER FRATUS | |

**PAPPERT, J.**                                                      **January 6, 2021**

### MEMORANDUM

Peter Fratus was charged by indictment with interstate communication of threats in violation of 18 U.S.C. § 875(c) on August 27, 2020.  On June 8, during an interview at his home he told law enforcement officers he sent threatening emails to Philadelphia Police Commissioner Danielle Outlaw.  He moves to suppress those statements, contending the interview was a custodial interrogation, he was denied his right to counsel and his statement was coerced.  The Court held a hearing on December 16 and denies the Motion for the reasons that follow.

I

A

i

On June 6, Commissioner Outlaw received two threatening emails containing racist and antisemitic language from 617slave2btrained@gmail.com, an email address purportedly belonging to a Kevin Johnson.  (Mot. to Suppress 5, ECF No. 18); (Gov't Resp. 1–2, ECF No. 19.)[1]  The FBI in Philadelphia discovered both emails were sent from the same Comcast IP address and an iPhone with IOS 13.5.1.  (Gov't Resp. 2.)  After obtaining subscriber information from Comcast and Apple, the FBI asked their

---

[1]      Record citations reflect ECF document page numbers.

colleagues in Boston to interview Fratus, who lived in West Dennis, Massachusetts, about the emails. (*Id.*). The Boston FBI assigned this task to Geoffrey J. Kelly, a special agent with twenty five years of experience. (Hr'g Tr. 7:7–8, 8:17–9:1.) Special Agent Kelly testified at the hearing and the Court found him credible. Fratus also testified. While he corroborated certain aspects of Kelly's testimony, Fratus was not credible when it came to recounting those parts of the interview that he thought essential to his defense.

ii

On June 8, Kelly, Sergeant Thomas Mahon and Trooper John MacDonald from the Massachusetts State Police and Detective Matthew Turner from the Dennis Police went to Fratus's home to interview him. (Mot. to Suppress Ex. A 1, ECF No. 18-1.) Before the interview, Kelly knew little about the FBI's investigation of Fratus other than the contents of the FBI's lead and that a couple of threatening emails originated from Fratus's address. (Hr'g Tr. 10:14–19.) Kelly and Turner were focused on the emails sent to Commissioner Outlaw. (*Id.* at 9:10–15.) Mahon and McDonald were there to ask Fratus about separate threats sent to Massachusetts Attorney General Maura Healey. (*Id.* at 9:24–10:5.)

The officers arrived in two cars at approximately 9:30 pm. (*Id.* at 13:18–22, 24:13–17.) They parked in front of the home and walked to Fratus's unit entrance in the backyard using flashlights to light their path. (*Id.* at 14:14–23, 34:2–5.) Special Agent Kelly knocked on the door and asked to speak with Fratus. (*Id.* at 15:1–5.) Fratus came outside and joined the officers in his backyard. (*Id.* at 58:1–5.)

None of the officers had a warrant for Fratus's arrest and Kelly had no intention

of arresting Fratus.  (Gov't Resp. 2); (Hr'g Tr. 11:24 – 12:3.)  All were dressed in plainclothes with no indicia of their law enforcement status.  (*Id.* at 12:8–23.)  Each carried firearms which were concealed by their clothing (Gov't Resp. 2), though  Fratus testified he saw the guns.  (Hr'g Tr. 52:7–15.)

Fratus assumed the officers were law enforcement when they came to his door (*Id.* at 52:16–25) and the officers disclosed their identities before questioning began. (*Id.* at 15:22–16:2.)  Kelly told Fratus the FBI in Philadelphia was investigating threatening emails sent to Commissioner Outlaw and the Massachusetts State Police was investigating threats sent to Attorney General Healey.  (*Id.* at 16:3–21.)  Fratus told the officers "that with all of the civil unrest occurring in the country today, he could not believe the number of law enforcement officers that were present and he felt threatened."  (Mot. to Suppress Ex. A 1); (Hr'g Tr. 16:22–17:3.)

Before asking any questions, Kelly also told Fratus the interview was voluntary, he had the right to refuse to speak and he was free to end the interview at any time. (Hr'g Tr. 17:4–8); (Mot. to Suppress Ex. A 1); (Gov't Resp. 3.)  Fratus asked if he "needed an attorney."  (Hr'g Tr. 53:13–15.)  Kelly responded "he certainly could consult with his attorney, that was his right" but said that Fratus was not under arrest and would not be arrested that evening.  (*Id.* at 17:9–15.)  Fratus likewise testified the officers told him he was not under arrest when he "first stepped outside."  (*Id.* at 60:4–7.)  Fratus then agreed to be interviewed without an attorney present.  (*Id.* at 17:16–17, 40:19–41:7.)

iii

Kelly testified this was the first in-person interview he conducted since the

beginning of the COVID-19 pandemic and he (and the other officers) maintained a social distance of approximately eight to ten feet from Fratus. (*Id.* at 19:15–23, 45:21–46:1, 49:3–8.) Fratus, who had been allowed to retrieve his iPhone and a pack of cigarettes from inside the house, sat on a hot tub in his backyard smoking cigarettes and Houst stood in the doorway during the interview. (*Id.* at 54:24–55:6, 58:6–8.) Kelly testified Houst was present for the entire interview, but Fratus claimed Houst was pulled to the side for a bit. *See* (*id.* at 15:13–19, 49:16–19, 58:18–22, 60:11–18).

Kelly testified he used passive words throughout the interview to sound less threatening. (*Id.* at 26:19–27:1.) Fratus initially could not remember if he sent emails to Commissioner Outlaw and denied owning the email account 617slave2betrained @gmail.com. (*Id.* at 18:4–9.) But he also said if he sent emails to Commissioner Outlaw, he was merely exercising his First Amendment rights and he did not intend to hurt anyone. (*Id.* at 18:17–24.) And he pulled up his email sent folder on his iPhone to show Kelly he had not contacted Commissioner Outlaw, but stated he was only showing his email account pfratus617@gmail.com. (*Id.* at 19:1–11.)

Based on his decades of experience, Kelly believed Fratus was being evasive and untruthful and told Fratus that if he was going to lie he should just refuse to be interviewed. (*Id.* at 18:13–24, 19:13–20:4.) Given the pandemic, Kelly was worried about contracting the virus and "did not want to be standing [t]here, playing . . . game[s]." (*Id.* at 19:13–20:4.) He also told Fratus that if he was just "blowing off steam" and did not intend to hurt anyone, he should let the officers know. (*Id.* at 21:22–22:2.) Houst also encouraged Fratus to be truthful. (*Id.* at 27:25–11, 49:20–24.)

Fratus then said "he was in fact just blowing off steam." (*Id.* at 22:3–4.) Kelly asked Fratus to state in his own words what he had done, and Fratus admitted he sent the emails to Commissioner Outlaw using his account 617slave2betrained@gmail.com under the alias Kevin Johnson. (*Id.* at 22:5–21.) Fratus told the officers he "crossed the line," was sorry for what he did, had no intention of hurting anyone and would never send threatening emails of that nature again. (*Id.* at 22:6–10, 23:21–24:7.) After Fratus admitted to emailing Commissioner Outlaw, Kelly's "work was done" and he turned the interview over to Sergeant Mahon and Trooper McDonald. (*Id.* at 23:2–10.) When their questioning ended, Kelly told Fratus he would send his report to the Philadelphia FBI and they would decide whether to prosecute him. (*Id.* at 24:4–7.)

Kelly stated based on the time the officers arrived at Fratus's home and the time they left, the interview lasted thirty to thirty-five minutes. *See* (*id.* at 24:10–25). For his part, Fratus did not know the interview's specific duration other than it lasted the amount of time it took him to smoke four or five cigarettes. (*Id.* at 60:11–18.) Fratus was never restrained or threatened, and no officer placed a hand on Fratus or displayed a weapon to him. (Hr'g Tr. 25:21–26:11, 59:11–60:3.) No one told Fratus he was not free to leave. *See* (*id.* at 26:12–18); (Gov't Resp. 5). But Fratus testified given the number of officers and "the show of force there, I figured that I would be arrested if I didn't cooperate with them." (Hr'g Tr. 57:6–14.) He also said "I have had incidents with the police before where they have not been truthful with me, and I thought that I was going to be arrested one way or another." (*Id.*)

iv

Fratus's testimony corroborated Special Agent Kelly's description of the officers'

introductions, the advice Fratus received before questioning and the interview setting, but Fratus claimed he did not admit sending the emails to Commissioner Outlaw. He said even though Kelly told him he was there to ask "about emails being sent to Philadelphia," Kelly did not ask him specifics about those emails. (*Id.* at 53:16–17, 55:22–25.) The majority of the interview focused on Attorney General Healey and when Fratus he told Kelly he "crossed the line," he was referring to a voicemail he left Healey. (*Id.* at 54:6–15.) He further claimed he was "not aware of the[] emails" to Commissioner Outlaw or their contents until he was arrested on June 16. (*Id.* at 55:25–56:10.) Fratus went further, stating that while being transported to custody, an officer told him "the reason you didn't need a lawyer is because we didn't ask you specifically about the case." (*Id.*)

These parts of Fratus's testimony are in no way believable. To credit them would mean (aside from concluding that Special Agent Kelly perjured himself at the hearing) that Kelly received a very specific and limited assignment to ask Fratus about emails to the Philadelphia Police Commissioner, coordinated with local law enforcement to go to Fratus's home during a pandemic, but then never asked the questions he went there to ask. Moreover, Fratus conceded that during the interview he told Special Agent Kelly he used the email account 617slavetobetrained@gmail.com. (*Id.* at 61:13–18.) This concession is inconsistent with Fratus's claims.

B

Fratus contends his statements admitting he sent threatening emails to Commissioner Outlaw were obtained in violation of his Fifth Amendment rights. *See* (Mot. to Suppress 7–13). He asserts the interview at his home was a custodial

interrogation because a reasonable person in his situation would not have felt free to end it. *See* (*id*. at 9).  According to Fratus, the officers all "held a rank above that of an ordinary patrolman" and he was intimidated both by their number and positions. *See* (*id*.).  He says none of them advised him of his *Miranda* rights and they all ignored his requests for counsel. *See* (*id*. at 8–10).

Fratus further alleges his incriminating statements were involuntary because they were elicited through psychological coercion and that he only admitted he sent the emails after Kelly admonished him to answer questions truthfully or end the interview and advised him he did not need counsel. *See* (*id*. at 11).

The Government acknowledges the interview was an interrogation and Fratus was not given his *Miranda* warnings, but contends Fratus was never in custody. *See* (Gov't Resp. 5–6); (Hr'g Tr. 68:19–69:4, 73:21–74:1).  Further, Fratus never properly invoked his Fifth Amendment right to counsel because his inquiry about consulting a lawyer was not a clear and unambiguous request. *See* (Gov't Resp. 7–8).  The Government also contends "there is no evidence whatsoever" that officers used psychological coercion to elicit involuntary statements from Fratus.  (*Id*. at 6.)

## II
### A

The Fifth Amendment's prohibition against compelled self-incrimination requires that a custodial interrogation be preceded by *Miranda* warnings. *See Edwards v. Arizona*, 451 U.S. 477, 481–82 (1981).  If *Miranda* warnings are not issued a "presumption of compulsion" applies, *Oregon v. Elstad*, 470 U.S. 298, 307 (1985), and "evidence resulting from the questioning must be suppressed." *United States v. Jacobs*, 431 F.3d 99, 104 (3d Cir. 2005) (citing *Miranda v. Arizona*, 384 U.S. 436, 444–45

(1966)).  A custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  *Miranda*, 384 U.S. at 444.  Law enforcement is not required to give *Miranda* warnings outside of a custodial interrogation.  *See United States v. Willaman*, 437 F.3d 354, 359 (3d Cir. 2006).

Custody requires "circumstances that are thought generally to present a serious danger of coercion."  *Howes v. Fields*, 565 U.S. 499, 508–09 (2012).  To determine whether a person is in custody, "the initial step is to ascertain whether, in light of the objective circumstances of the interrogation . . . a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave."  *Id.* at 509 (internal citations and quotations omitted); *see also J.D.B. v. North Carolina*, 564 U.S. 261, 262 (2011) ("[T]he test involves no consideration of the particular suspect's 'actual mindset'") (citation omitted).  Courts must consider the totality of circumstances surrounding an interrogation to determine how an individual would have assessed his freedom of movement.  *See id.* (quoting *Stansbury v. California*, 511 U.S. 318, 322, 325 (1994) (per curiam)).

Relevant circumstances include the location and duration of questioning, statements made during questioning, the presence or absence of physical restraints and the release of the interviewee at the end of questioning.  *See Howes*, 565 U.S. at 509. The Third Circuit also considers whether the interviewee voluntarily participated; whether other coercive tactics, like hostile tones of voice or display of weapons, were used; whether the questioner believed the interviewee to be guilty and, if so, whether this was revealed to the interviewee; whether the interviewee was told he was not

under arrest; and whether the interviewee agreed to meet knowing that he would be questioned about a criminal offense. *See United States v. Ludwikowski*, 944 F.3d 123, 132 (3d Cir. 2019).

Even if passed, "the freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody." *Maryland v. Shatzer*, 559 U.S. 98, 112 (2010). Courts must also determine "whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Howes*, 565 U.S. at 509; *Ludwikowski*, 944 F.3d at 131 (same).

B

An individual has a Fifth Amendment right to counsel during a custodial interrogation. *See Edwards*, 451 U.S. at 482. "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." *Miranda*, 384 U.S. at 474. There is no Fifth Amendment right to counsel absent a custodial interrogation. *See McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991).

An invocation of the right to counsel must be unambiguous. *See Davis v. United States*, 512 U.S. 452, 459 (1994); *see also id.* at 462 ("[m]aybe I should talk to a lawyer" not an invocation of right to counsel); *Burket v. Angelone*, 208 F.3d 172, 197–98 (4th Cir. 2000) ( "I think I need a lawyer" not an invocation of right to counsel). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Davis*, 512 U.S. at 459 (emphasis in original).

9

C

Involuntary statements made to law enforcement are inadmissible. *See Jacobs*, 431 F.3d at 108. Custody is not dispositive of whether statements were voluntary. *See Ludwikowski*, 944 F.3d at 135. A noncustodial confession can be involuntary in "special circumstances." *See id.* (citing *Beckwith v. United States*, 425 U.S. 341, 347–48 (1976)). The Government bears the burden of proving statements were "the product of an essentially free and unconstrained choice" by a preponderance of the evidence. *See Ludwikowski*, 944 F.3d at 135 (citation omitted).

Coercive police activity is "[a] necessary predicate to a finding of involuntariness." *Jacobs*, 431 F.3d at 108. Involuntariness also requires a "causal connection between the police conduct and the confession." *Id.*; *see also Halsey v. Pfeiffer*, 750 F.3d 273, 303 (3d Cir. 2014) ("[T]he circumstance that a suspect would not have confessed if he had not been interrogated does not mean that his confession was involuntary."). Law enforcement is permitted to use some psychological tactics to elicit a confession. *See Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir. 1986). Thus, "a confession is not rendered involuntary simply because the police procured it by using psychological tactics." *Halsey v. Pfeiffer*, 750 F.3d 273, 304 (3d Cir. 2014).

To assess coercion, courts must consider "the specific tactics utilized by the police in eliciting the admissions, the details of the interrogation, and the characteristics of the accused" to determine whether "the defendant's will was overborne when he confessed." *Halsey*, 750 F.3d at 303–04 (internal quotations and citation omitted). The Third Circuit has considered police tactics such as "the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature

of questioning; and the use of physical punishment such as the deprivation of food or sleep." *Id.* (citations omitted).  It has also considered defendants' youth, lack of education or low intelligence and background and experience, including experience with the criminal justice system.  *See Ludwikowski*, 944 F.3d at 135 (citations omitted).

III

A

Fratus's interview was noncustodial; the questioning's objective circumstances presented no danger of coercion.  He was told he was not under arrest when he "first stepped outside."  *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (defendant being "immediately informed that he was not under arrest" factor indicating noncustodial questioning).  Special Agent Kelly also told Fratus he could decline to be interviewed and he was free to end the questioning at any time.  He even invited Fratus to end the interview when he suspected Fratus was being untruthful.[2]

The interview took place in Fratus's backyard, with his partner present, while Fratus sat on a hot tub and smoked cigarettes for no more than thirty-five minutes. Fratus was allowed back into his home during the interview to retrieve his phone and cigarettes.  The officers maintained a social distance from Fratus due to the pandemic. The officers never threatened Fratus, put a hand on him, restrained him in any way or displayed their weapons, and Fratus was free to walk back into his home as soon as the interview ended.  *See United States v. Morgan*, 562 F. App'x 123, 130 (3d Cir. 2014)

---

[2]    While under certain circumstances Kelly's statement to Fratus could be perceived as coercive, based on the totality of circumstances here and the credibility of Kelly's testimony, the statement is further evidence Fratus was free to end the conversation.  *Cf. Stansbury v. California*, 511 U.S. 318, 325 (1994) (per curiam) (an officer's knowledge or beliefs regarding an individual's guilt is "relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her 'freedom of action'").

11

(two-hour interview noncustodial in room with two unblocked exits where officers were not hostile and did not display weapons or restrict interviewee's movement).  Even crediting Fratus's claim that he felt threatened and unable to leave due to the ranks and number of officers present, a reasonable person would not have felt unable to leave under all of these circumstances.

Moreover, the setting of the interview was a far cry from an environment that "presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Howes*, 565 U.S. at 509; *see also United States v. Willaman*, 437 F.3d 354, 360 (3d Cir. 2006) (citing approvingly *United States v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) ("When a person is questioned *on his own turf*, . . . the surroundings are not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation.") (emphasis in original)).

## B

Because Fratus was not subject to a custodial interrogation, he did not have a Fifth Amendment right to counsel during the interview.  Even if he had the right, he did not properly invoke it.

Special Agent Kelly testified Fratus asked him once before the interview "if he should consult with an attorney."  (Hr'g Tr. 17:9–25.)  Fratus testified he spoke to Kelly about an attorney three times, but described only two of those discussions.  (*Id.* at 56:13–24.)  He asked Kelly before the interview if he "needed an attorney."  (*Id.* at 53:13–15.)  He also said "this sounds like it's getting pretty specific, are you sure I don't need a lawyer?" when Kelly questioned him about the email address 617slavetobetrained@gmail.com.  (*Id.* at 55:2–12.)

Even crediting Fratus's account of his requests, one of which is similar to Kelly's, Fratus never said he wanted a lawyer. *See, e.g.*, (*Id.* at 53:13–15, 55:2–12, 91:3–8.) None of his inquiries regarding the need for an attorney were an unambiguous request for counsel. *See, e.g.*, *United States v. Mohr*, 772 F.3d 1143, 1145–46 (8th Cir. 2014) ("Should I get a lawyer at this time? . . . I think I should get one" not an unequivocal invocation of right to counsel); *United States v. Wysinger*, 683 F.3d 784, 795 (7th Cir. 2012) ("I mean, do you think I should have a lawyer? At this point?" not an unequivocal request for counsel); *Diaz v. Senkowski*, 76 F.3d 61, 63–64 (2d Cir. 1996) ("Do you think I need a lawyer?" not an invocation of right to counsel); *United States v. Posada-Rios*, 158 F.3d 832, 867 (8th Cir. 1998) (Defendant's comment she "might have to get a lawyer then, huh?" insufficient to invoke right to counsel).

## C

This case is not "the outlier [the Supreme Court] contemplated in *Beckwith*" when it recognized a confession could be involuntary in "special circumstances" absent a custodial interrogation. *See Ludwikowski*, 944 F.3d at 135. The Government has met its burden of proving Fratus's statement were voluntary.

The interview took place in an unenclosed space, it was not prolonged or intensive, the officers did not use any physical threats and Fratus had his cell phone, cigarettes, and partner nearby during questioning. *See id.* at 135–36 (questioning did not "bear the hallmarks of coercion" where officers' conduct was not physically threatening, door to room was not locked and interviewee had cell phone). Fratus confessed to sending the emails after he was told he would not be arrested and could refuse to be interviewed. He was not under the influence of drugs or alcohol and he

never stated or in any way indicated that he was unable to understand the nature and consequences of the interview.[3]  There is no evidence the officers obtained his confession using psychological coercion sufficient to overbear Fratus's will.

Fratus's past encounters with law enforcement do not support his claim that his experience with police being untruthful led him to believe he would be arrested on June 8 if he did not cooperate.  Those assertions are not credible given Fratus's acknowledgement that he has been "extremely drunk every time [he] was arrested." (Hr'g Tr. 63:10–14.)  Moreover, while he has had negative encounters with police, police have also looked after Fratus on several occasions after suicide attempts.  *See* (*id.* at 65:20–22, 32:20–33:4, 65:23–66:2); (Mot. to Suppress Ex. B).  His experiences do not amount to special circumstances suggesting his statements were not the product of free will.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.

---

[3]     Fratus makes much of the fact that the local police, and perhaps Kelly, were aware he previously attempted suicide and exhibited signs of mental health issues.  *See* (Hr'g Tr. 32:11–19, 65:20–66:8, 84:20–85:9, 89:3–17).  This issue, and the extent to which Kelly knew about it, is irrelevant to assessing whether Fratus's statements were voluntary given the undisputed evidence that Fratus was lucid and coherent during the interview.  *See* (*id.* at 25:1 – 8, 25:16–20, 45:16–20, 89:3–90:11).  Fratus himself never said he was impaired or unwell during the interview.  *See generally* (*id.*).