IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>PETER FRATUS | CRIMINAL ACTION<br>NO. 20-270 |

**PAPPERT, J.**                                                                                                   **July 26, 2021**

## MEMORANDUM

The Government charged Peter Fratus by indictment on August 27, 2020 for knowingly communicating threats to kill Philadelphia Police Commissioner Danielle Outlaw in violation of 18 U.S.C. § 875(c). His trial, delayed by the COVID-19 pandemic, is scheduled to begin September 13. (ECF 39.) On October 9, 2020, the Government filed a Motion *in Limine* to introduce "prior acts" evidence against Fratus at trial. Having considered the evidence and the parties' briefing, the Court grants the Motion in part and denies it in part.

I

A

In June of 2020, Fratus sent Outlaw two emails in quick succession. (Mot. *in Limine* 1, ECF 17.) The first included the subject line, "Answer the phone," and this message: "Calling the police now for an emergency. No answer. Dirty n*****! Find a n***** hang a n*****. Jews into the ovens!!!"[1] (*Id.*) The second email featured the subject line, "Find a n***** kill a n*****," and said: "Where does police chief live?" (*Id.* at 1–2.) Law enforcement determined that the messages came from an account linked

---

[1]     The Court has censored Fratus's racial slurs. Fratus did not.

1

to Fratus. (*Id*. at 2.) Several FBI agents, Massachusetts State Police officers and local police officers visited Fratus's home in Massachusetts to interview him. (*Id*.) Fratus admitted sending the emails and acknowledged that he "crossed the line." (*Id*.)

Apparently, launching racist, anti-Semitic, profanity-laced broadsides is nothing new for Fratus. The Government moves to introduce evidence at trial of eight prior instances where Fratus either verbally or physically attacked others.

First, the Government wants to introduce evidence that around the same time Fratus emailed Outlaw, he contacted a Jewish charity for children in New Jersey. (*Id*. at 5.) Fratus called the charity and told a representative: "Find a Jew, Kill a Jew. I'll find out where that f***ing day camp is and I'll find out where they are and I'll kill all those f***ing kids, how about that?" (*Id*.) Fratus also left three voicemails. In the first, he said: "Just trying to find where Jews live so I can kill them. Find a Jew, Kill a Jew. Find a Jew, Kill a Jew. Find a N*****, Kill a N*****. Find a Jew, Kill a Jew." (*Id*.) He further threatened to slit a rabbi's and children's throats. (*Id*.) Fratus "invited the charity to call the FBI," telling them that otherwise he would find the children and put them in an "oven." (*Id*.) Finally, Fratus said, "you all are going to f***ing die . . . kids first then the parents." (*Id*. at 6.) In the second voicemail, Fratus said he wanted to find the rabbi and "blow up the Jewish heritage" before repeating, "Find a Jew, Kill a Jew," and again promising to find the kids and put them in an oven. (*Id*. at 6.) And in the third voicemail, Fratus said: "I'm trying to find out where Jews live so I can kill them. . . . I hate Jews, I want them in the f***ing oven." (*Id*.)

Second, the Government wants to introduce evidence that in March of 2019 Fratus entered a store, wiped his bloody hands on a towel and left the towel on a

counter. Employees called the police and, when they arrived, Fratus accosted, kicked and hit them. (*Id.*) As officers took him to the police station, he alluded to an officer who had been shot in the face and killed, saying: "In two days that will be you. You'll be f***ing dead. So will your wife and kids. Shot in the face. . . . You'll see. You'll be f***ing dead. Just wait." (*Id.* at 6–7.) Later on at the station, Fratus again referenced the murdered officer and told another officer that he would be next. (*Id.* at 7.)

Third, the Government asks the Court to allow evidence that in July of 2018 Fratus left a two-minute voicemail for African-American Congresswoman Maxine Waters. (*Id.*); (Resp. at 15.) Fratus called Waters a "dumb f***ing n*****" and warned that she should be careful going out to eat because "maybe she will be assaulted." (Mot. at 7.) He went on: "[Y]ou are all a bunch of dumb n*****s who were brought here on slave ships, you should be grateful for it, stop being unacceptable and ungrateful, before you guys get whipped again, or maybe we will just have to f***king put you in the f***ing ropes where you belong." (*Id.*) Unfortunately, Fratus's tirade didn't stop there. He told her she should shut her mouth or "go back to Africa where you f***ing belong" and said "we're going to resist to her f***ing face, we're going to resist to her home, we're going to resist to her children, we're going to resist to every f***ing n***** we see, until they start hanging from f***ing trees where you all belong, lynching has come back." (*Id.* at 8.) Finally, he said: "Look forward to those nooses hanging from the trees, you dumb f***ing n*****s." (*Id.*) Fratus admitted to law enforcement that he left this message and acknowledged the seriousness of doing so. (*Id.*)

Fourth, the Government wishes to introduce evidence that Fratus left two threatening, profane voicemail messages with an Islamic cultural center in February of

3

2017. (*Id.*) In those messages, Fratus referenced "dirty Muslims," "sand n*****s," and "desert monkeys." (*Id.*) He said Islam is a "child molesting f***ing cult" and threatened that "you won't be here for long" because "everyone is coming for you." (*Id.*) He elaborated that "you all are going to burn, we are coming for you, ok, you, your children, your parents, you dirty terrorist scum." (*Id.*) Fratus then threatened an attack on Mecca and made explicit sexual references to "Arab women." (*Id.* at 8–9.)

Fifth, the Government asks the Court to allow evidence that in April of 2016 Fratus entered a Palestinian-American-owned business and accused the owner of being a terrorist. (*Id.* at 9.) During this incident, Fratus also told an African-American customer that African-Americans were responsible for bringing drugs to Cape Cod. (*Id.*) After Fratus pushed another customer, employees held him down until police arrived. (*Id.*) The police arrested him and took him to a hospital for evaluation during which he accosted the officers and said, "everyone wants to kill police." (*Id.*)

Sixth, the Government seeks to introduce evidence that in September of 2015 Fratus yelled obscenities and racial slurs at homeless people in Boston. (*Id.* at 9–10.) He then punched a homeless man in the head, knocking him to the ground. (*Id.* at 10.) Fratus kicked the man in the head repeatedly until a bystander intervened. (*Id.*) Then he attacked the bystander. (*Id.*)

Seventh, the Government wants to introduce evidence that Fratus assaulted an African-American female in public in September of 2011. (*Id.*) Fratus punched the woman multiple times, kicked her in the back and pulled out her hair extensions. (*Id.*)

Finally, the Government wants the jury to know that Fratus attacked a transportation authority inspector after trying to avoid paying a train fare. (*Id.*) The

4

inspector sustained injuries to his head, back, arm and leg. (*Id.*)  Unsurprisingly, Fratus became belligerent with the responding medical personnel.  (*Id.*)

### B

In its Motion, the Government argues Fratus's prior bad acts go to his knowledge and intent to threaten Outlaw.  (*Id.* at 14.)  It contends the calls to the Jewish charity are particularly probative of knowledge and intent because they occurred within hours of the emails to Outlaw and he invited the charity to notify the FBI.  The Government argues that the voicemail for Congresswoman Waters is also especially probative because Fratus acknowledged the seriousness of his threats when law enforcement confronted him.  (*Id.*)  The Government adds that Fratus's violent acts show that his emails to Outlaw were not "simply idle talk or jest, but a serious expression of [his] intention to commit an unlawful act."  (*Id.*)

For his part, Fratus argues this evidence is impermissible propensity evidence meant to paint him as a bad person and turn the jury against him.  (Resp. to Mot. 7, 9, ECF 20.)  He posits that his past acts "do[] not shed light on whether [he] 'transmit[ted] a communication for the purpose of issuing a threat or with knowledge that the recipient [would] view it as a threat.'"  (*Id.*) (quoting *United States v. Elonis*, 841 F.3d 589, 597 (3d Cir. 2016)) (alterations in original).  And he contends that evidence of these past acts is profoundly prejudicial and only marginally probative.  (*Id.*)

### II

### A

Prior bad acts may be admitted as intrinsic or extrinsic evidence.  *See United States v. Green*, 617 F.3d 233, 245 (3d Cir. 2010).  Evidence is intrinsic, and not subject

5

to Federal Rule of Evidence 404(b), only if it directly proves the charged offense or if the "uncharged acts [are] performed contemporaneously with the charged crime [and] they facilitate that commission of the charged crime." *Id.* at 248–49.

Courts analyze extrinsic prior act evidence under Rule 404(b), which prohibits evidence of "a crime, wrong, or other act" used "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). This evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The "permitted uses" of prior act evidence set forth in Rule 404(b)(2) are treated like exceptions to 404(b)(1)'s "prohibited uses," and "the party seeking to admit evidence under 404(b)(2) bears the burden of demonstrating its applicability." *United States v. Caldwell*, 760 F.3d 267, 276 (3d Cir. 2014); *see also id.* ("Rule 404(b) is a rule of general exclusion, and carries with it no presumption of admissibility.") (internal quotations and citation omitted). "Rule 404(b) must be applied with careful precision, and . . . evidence of a defendant's prior bad acts is not to be admitted unless both the proponent and the District Court plainly identify a proper, non-propensity purpose for its admission." *Id.* at 274 (citing *United States v. Davis*, 726 F.3d 434, 442 (3d Cir. 2013)).

Prior bad act evidence must satisfy a four-part test to be admissible under Rule 404(b). Specifically, the evidence must be:

6

>(1) offered for a proper non-propensity purpose that is at issue in the case; (2) relevant to that identified purpose; (3) sufficiently probative under Rule 403 such that its probative value is not outweighed by any inherent danger of unfair prejudice; and (4) accompanied by a limiting instruction, if requested.

*Id.* at 277–78 (citing *Davis*, 726 F.3d at 441).

Evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. For evidence offered pursuant to Rule 404(b) to be relevant, it must fit into an inferential chain "no link of which is a forbidden propensity inference." *United States v. Repak*, 852 F.3d 230, 243 (3d Cir. 2017) (internal quotations and citation omitted). The Court may exclude relevant evidence if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

### III

As an initial matter, none of the eight prior acts the Government cites are intrinsic evidence of the charged offense. Even Fratus's calls to the Jewish charity, placed around the same time as the emails to Outlaw, cannot directly prove the crime or be fairly viewed as a contemporaneous action that facilitated it. Some of the prior bad acts are nonetheless admissible as extrinsic evidence under Rule 404(b) because they satisfy the four-part test.

### A

First, the Government wishes to use the calls to the Jewish charity to show that Fratus had the requisite knowledge and intent to convey a threat in violation of 18

7

U.S.C. § 875(c).  When evaluating whether a non-propensity purpose is at issue in a case, courts "consider the 'material issues and facts the government must prove to obtain a conviction.'"  *Caldwell*, 760 F.3d at 276 (citing *United States v. Sampson*, 980 F.3d 883, 888 (3d Cir. 1992)); *see also United States v. Brown*, 765 F.3d 278, 291 (3d Cir. 2014) ("[T]he government cannot offer Rule 404(b) evidence for a non-propensity purpose if doing so would not materially advance the prosecution's case.").

Here, the Government must prove, *inter alia*, that Fratus had the subjective intent to convey a threat to Outlaw.  *Elonis*, 841 F.3d at 596.  It can do so by presenting evidence showing Fratus's purpose or knowledge.  *Id.*  The content of Fratus's calls to the Jewish charity and their proximity to his emails to Outlaw will assist the jury in determining whether Fratus had the requisite intent to threaten Outlaw.  *See United States v. Bedell*, No. 08-cr-299, 2009 WL 10678900, at *3 (M.D. Pa. Mar. 24, 2009) ("Where the prior acts are similar enough and close enough in time to be relevant to the instant case, the repetition of the crime is itself circumstantial proof of intent, not direct proof of a propensity to commit crime.") (quotation marks and citation omitted). Plus Fratus invited the charity to notify the FBI, suggesting he understood that his messages were illegal.  *See United States v. Christy*, No. 18-cr-223, 2019 WL 636981, at *8 (M.D. Pa. Feb. 14, 2019) (admitting evidence of prior acts under Rule 404(b) that tend to show "consciousness of guilt" in case involving threat).  The Government therefore avers a proper non-propensity purpose for introducing evidence of the calls to the Jewish charity under Rule 404(b).

Second, the Government has demonstrated that these calls fit clearly into a logical chain of inferences consistent with its theory of its case, "no link of which is a

forbidden propensity inference." *Repak*, 852 F.3d at 243. Again, the calls are relevant to showing Fratus's subjective intent because they involve similar language and reference the FBI. To the Government, these calls make it more probable that Fratus intended to threaten Outlaw.

Third, allowing the jurors to learn about these calls would not create a risk of unfair prejudice that substantially outweighs their probative value, which is high. Fratus will likely argue that he did not intend to convey a true threat to Outlaw. The calls to the Jewish charity allow the Government to attempt to show that Fratus used similar racist, anti-Semitic language when conveying an explicit threat to the charity around the same time he emailed Outlaw. Any risk of prejudice this evidence presents does not outweigh its probative value. Fratus is concerned that jurors may find these calls repulsive and consider convicting him out of fear that he will follow through on his threats or because they believe he is a racist, anti-Semite worthy of punishment. (Resp. to Mot. at 8.) He is also worried the jury will think he has a propensity to issue threats. (*Id*. at 7, 21.) The Court will address any prejudice along those lines with a limiting instruction if requested.

### B

The Court will allow evidence of Fratus's call to Congresswoman Waters for largely the same reasons. Although Fratus recorded that voicemail about two years before emailing Outlaw, he used similar language and acknowledged the seriousness of his conduct when law enforcement questioned him. Like the calls to the Jewish charity, this voicemail makes it more likely that Fratus possessed the requisite intent to threaten Outlaw. And like those calls, unfair prejudice does not substantially outweigh

9

the high probative value of this voicemail.  Fratus argues the Court must exclude the voicemail because it was more inflammatory than his emails to Outlaw and distinguishable because it was more specific and targeted than the emails.  (Resp. to Mot. at 14–16.)  Although the voicemail is longer and more detailed than the emails, it will help the jury discern whether Fratus possessed the subjective intent to convey a threat to Outlaw.  The Court can address with a limiting instruction the risk that jurors may be inclined to convict Fratus for this conduct, because they think he is a bad person or because they believe he has a propensity for issuing threats.

C

The remaining past acts are inadmissible.  The Government does not seek to introduce evidence of Fratus's attacks on police, a homeless man, an African-American woman and a transit inspector for a proper non-propensity purpose.  Put simply, these acts do not show that Fratus possessed the subjective intent to threaten Outlaw in June of 2020.  And each act seriously risks unfairly prejudicing Fratus by painting him as "violence-prone," which could "frighten[] the jury into ignoring evidence that otherwise might have raised a reasonable doubt about whether he intended a serious threat" or lead the jury to infer "that he intended violence in this particular instance."  *United States v. Himelwright*, 42 F.3d 777, 786 n.8 (3d Cir. 1994).  "That inference is precisely what Rule 404(b) prohibits."  *Id.*; *see also United States v. Moore*, 375 F.3d 259, 265 (3d Cir. 2004) (Rule 404(b) evidence improperly admitted where it likely led jury to convict "because it thought [defendant] to be a violent and dangerous man, a 'terrorist' of sorts").

Evidence of Fratus's violent history also fails Rule 403 balancing.  These

10

instances of past violence are not highly probative of Fratus's subjective intent to convey a threat to Outlaw. Although Fratus has attacked police officers and African-Americans, those attacks hold little probative value because they occurred years before and in different contexts than his emails to Outlaw. Instead, this evidence risks unfairly prejudicing Fratus by leading the jury to see him as a bad person or someone who poses a threat to society. This risk is so significant "that, regardless of any limiting instructions given by the Court, a substantial danger [would] remain[] that the proffered evidence would 'lure the fact finder into declaring guilt on a ground different from proof specific to the offense charged.'" *United States v. Barnes*, No. 05-cr-134, 2005 WL 2994698, at \*6 (E.D. Pa. Aug. 16, 2005) (quoting *Old Chief v. United States*, 519 U.S. 172, 180 (1997)).

Although the Government avers that it seeks to admit evidence of Fratus's threats to police officers, an Islamic cultural center and a Palestinian-American business owner to prove knowledge and intent, the risk of unfair prejudice from this evidence substantially outweighs its probative value. Fratus's comments are heinous and inflammatory and will undoubtedly impugn his character before the jury. And unlike his contemporaneous calls to the Jewish charity and his 2018 voicemail for Congresswoman Waters, these years-old comments bare little connection to the Outlaw emails in time and substance and are less probative of intent. On balance, "the risk that the information will influence the jury to convict on improper grounds" greatly outweighs the Government's "genuine need for the [ ] evidence." *United States v. Sriyuth*, 98 F.3d 739, 747–48 (3d Cir. 1996) (citation omitted). Again, even the most forceful limiting instruction would not protect Fratus from the unfair prejudice this

11

evidence would cause.

       An appropriate Order follows.

                                BY THE COURT:

                                */s/ Gerald J. Pappert*
                                GERALD J. PAPPERT, J.