IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

v.

PETER FRATUS,

*Defendant.*

CRIMINAL ACTION

NO. 20-270

PAPPERT, J.                                                       December 28, 2021

**MEMORANDUM**

On September 15, 2021, a jury convicted Peter Fratus of transmitting a threat in interstate commerce in violation of 18 U.S.C. § 875(c). (ECF 68.) He now moves for a judgment of acquittal or a new trial pursuant to Federal Rules of Criminal Procedure 29 and 33. (ECF 78 and 79.) The Court denies both motions.

I

On the night of June 6, 2020, Philadelphia Police Commissioner Danielle Outlaw received two emails. (Trial Tr., Vol. I, at 30:25–31:7, 32:20–35:7, ECF 75). The first had the subject line "Answer the phone," followed by the message "calling the police now for an emergency. No answer. Dirty n*****! Find a n***** hang a n*****. Jews into the ovens!!!" (Gov. Ex. 2.) A second message with the subject line "Find a n*****

1

kill a n*****" arrived less than a minute later. (Gov. Ex. 4.) It asked one question: "Where does the police chief live?"[1] (*Id.*)

While these emails were sent under the alias "Kevin Johnson," law enforcement quickly tied them to Fratus. The emails came from an IP address associated with his home in West Dennis, Massachusetts, (Trial Tr., Vol. I, at 58:12–13; 61:23–25; 63:18–64:13), and the email account from which they were sent was linked by phone number and cookie to an account bearing Fratus' name, (*Id.* at 69:15–19; Gov. Exs. 10, 13). The "Kevin Johnson" account also contained personal details and pictures of Fratus. (Trial Tr., Vol. I., at 75:15–21; Gov. Exs. 41, 42, 43.)

Two days after Fratus sent the emails, FBI Special Agent Geoffrey Kelly visited him at his home. *See* (Trial Tr., Vol. II, at 31:24–32:5, ECF 77). Fratus initially told Kelly he didn't remember whether he sent the emails, though he added that if he had sent them, he was "merely exercising [his] First Amendment right." (*Id.* at 39:13–24.) In Kelly's experience, that type of hypothetical is "usually . . . some kind of admission." (*Id.* at 39:24–40:1.) Indeed, after Kelly expressed his exasperation with Fratus' evasion, Fratus admitted he had sent the emails. *See* (*id.* at 41:13–42:25).

These emails were not an isolated outburst. About twenty minutes after he sent them, Fratus left three antisemitic, threatening voicemails for Karz4Kids, a Jewish charity. (Gov. Exs. 31–34; Trial Tr., Vol. I, at 91:13–20; 92:19–93:1.) He made a similar racist call to Congresswoman Maxine Waters two years earlier, (Gov. Ex. 35; Trial Tr., Vol. II, at 85:8–21; 90:23–25), and the Google search histories associated with his email

---

[1]  The Court has censored Fratus' slurs. He did not.

accounts were littered with hateful queries, (Gov. Exs. 22, 23; Trial Tr., Vol. I, at 82:2–24).

On the second day of trial, Fratus took the stand. He admitted sending the emails to Commissioner Outlaw. (Trial Tr., Vol. II, at 121:21–24.) He also admitted leaving the voicemails for Congresswoman Waters and Karz4Kids. (*Id.* at 147:14–148:6.) He claimed, however, that he was too drunk to have intended the emails as threats. (*Id.* at 134:1–135:19, 146:17–22.)

Fratus testified about his heavy drinking and regular blackouts. *See e.g.* (*id.*, Vol. II, at 116:20–21; 121:13–14; 122:15–123:1; 127:14–17). He claimed to be able to complete complex tasks during these blackouts without remembering what he had done. (*Id.* at 127:14–128:6.) He believed he sent the emails in a similar state. (*Id.* at 134:1–135:19; 146:17–22.) Because he could not remember sending them, he "couldn't tell you what [his] intention was." (*Id.* at 146:20–22.) He also explained he never would have consciously sent the emails from the account associated with the alias Kevin Johnson because he used that email to engage in sexual activities he found shameful. (*Id.* at 137:11–138:21.)

II

A

Rule 29 of the Federal Rules of Criminal Procedure provides that a court, "on the defendant's motion[,] must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Evidence is insufficient if no "rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence." *United States v. Caraballo-*

*Rodriguez*, 726 F.3d 418, 430 (3d Cir. 2013) (en banc) (quoting *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005)). This standard is "highly deferential." *Id.* It requires courts to view the entire record—not just isolated parts—"in the light most favorable to the prosecution." *Id.* (quoting *Brodie*, 403 F.3d at 133). Courts "must be ever vigilant not to usurp the role of the jury by weighing credibility and assigning weight to the evidence." *Id.* (ellipsis omitted) (quoting *Brodie*, 403 F.3d at 133). To avoid "act[ing] as a thirteenth juror," a court must uphold any verdict that "does not 'fall below the threshold of bare rationality.'" *Id.* at 431 (quoting *Coleman v. Johnson*, 566 U.S. 650, 656 (2012)); *see also United States v. Jacobs*, No. 20-1200, 2021 WL 5934672, at *4 (3d Cir. Dec. 16, 2021).

B

A more deferential standard of review applies to motions for a new trial under Rule 33. That rule permits district courts to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Courts need "not view the evidence favorably to the Government," *United States v. Silveus*, 542 F.3d 993, 1004 (3d Cir. 2008) (quoting *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002)). That said, Rule 33 motions are "disfavored and should be 'granted sparingly and only in exceptional cases.'" *Id.* (quoting *Gov't of Virgin Islands Y. Derricks*, 810 F.2d 50, 55 (3d Cir. 1987)). A court may "order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it 'believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014) (quoting *Johnson*, 302 F.3d at 150). And a court may grant a new trial to cure an

4

error at trial only if the error (or errors) "had a substantial influence on the outcome of the trial." *United States v. Greenspan*, 923 F.3d 138, 154 (3d Cir. 2019) (quoting *United States v. Thornton*, 1 F.3d 149, 156 (3d Cir. 1993)).

### C

18 U.S.C. § 875(c) criminalizes transmitting in interstate commerce a communication containing a threat to kidnap or injure another person. The offense contains both an objective and a subjective component. *United States v. Elonis*, 841 F.3d 589, 596 (3d Cir. 2016). The Government must prove (1) that a reasonable person would view the communication as a threat and (2) that the defendant transmitted it "for the purpose of issuing a threat or with knowledge that the communication would be viewed as a threat." *Id.*

### III

### A

In his motion for acquittal, Fratus contends no reasonable juror could have concluded he had the subjective intent to communicate a threat to Commissioner Outlaw because the Government offered "scant evidence . . . to overcome" his testimony that he was blackout drunk when he sent the emails. (Mem. Supp. Mot. Acquittal at 5–6, ECF 78.)

Fratus' argument proceeds from a faulty premise. The only evidence of his purported intoxication when sending the emails was his own testimony, which the jury was not required to credit. The Court cannot acquit him on the theory that evidence

5

sufficient to establish his intent had he been sober was insufficient to convict him because he claimed to be drunk.

Fratus does not dispute that he sent the emails, (Trial Tr., Vol. II, at 121:21–24; 170:16–18), or even that a reasonable person would understand them as a threat, (Mem. Supp. Mot. Acquittal at 4). He merely asserts that his testimony regarding his alcoholism and his ability to "blackout, yet still function" undercut an otherwise reasonable inference about his intent. (*Id.* at 5). But assessing his intoxication defense requires "weighing credibility and assigning weight to the evidence." *Brodie*, 403 F.3d at 133. It is not a proper basis for a Rule 29 motion.

### B

Fratus raises two arguments in his motion for a new trial. Again, he claims his testimony regarding intoxication left him without the *mens rea* required to convict him. He also argues that the court erred in allowing Special Agent Kelly to testify that he interpreted Fratus' hypothetical about exercising his First Amendment rights as an admission. Neither argument has any merit.

### 1

The Government presented ample evidence that Fratus intended his communications as threats. Indeed, the violent nature of the emails was enough for the jury to so conclude. *See United States v. Elonis*, 841 F.3d at 599–600. The jury also heard voicemails in which Fratus levelled similarly disturbing threats at a Jewish charity and a Black congresswoman. Those messages strengthened the inference that

6

Fratus's emails were intended to threaten Commissioner Outlaw.  *See* (Mem. Op. at 7–10, ECF 46).

Fratus' own admissions were further evidence of his intent.  According to Agent Kelly, Fratus acknowledged he "crossed the line" when he emailed Commissioner Outlaw.  (Trial Tr., Vol. II, at 42:23–24; 43:15–17.)  And at trial, Fratus testified that he "lash[ed] out" at Commissioner Outlaw and others because he "wanted the world to feel the pain, the hurt, the disgust that [he] felt inside."  (*Id.* at 121:21–122:1.)

Fratus' attempted intoxication defense did little to blunt the force of this evidence.  Even if the jury believed every word of Fratus' testimony, it could still convict him.  What matters is what he knew or intended at the time he sent the emails, not what he remembered the next day.  *See United States v. Wandahsega*, 924 F.3d 868, 885 (6th Cir. 2019) (distinguishing between the ability to form memories and the ability to act intentionally or knowingly); *Breakiron v. Horn*, No. 00-300, 2008 WL 4412057, at *38 (W.D. Pa. Sept. 24, 2008) (same), *rev'd in part on other grounds*, 642 F.3d 126 (3d Cir. 2011).

Here, Fratus' testimony showed he could and did act intentionally during his alleged blackouts.  He gave examples of complex tasks he completed while in a blackout state, including looking up and following "labor intensive recipes."  (Trial Tr., Vol. II, at 127:23–128:6.)  During one blackout, he told his partner that he was going to Provincetown, forty-five minutes from his home, then proceeded to drive there and

back.  (*Id.* at 127:18–22, 182:8–183:10).  These vignettes undermined his claim that a blackout prevented him from intending to threaten Commissioner Outlaw.

Fratus' intoxication defense was also inconsistent with his conduct on the night of June 6.  That night, Fratus searched for and sent harassing emails or voicemails to three different targets: Commissioner Outlaw, Karz4Kids, and Massachusetts Attorney General Maura Healey.  (*Id.*, Vol. I, at 83:4–84:24, Vol. II, at 170:14–172:5, 176:14–10; Gov. Exs. 2, 4, 23, 31–34, 26, 27.)  His methodical and repeated conduct showed he was in control of his actions, even if he did not remember them.

2

Nor was it error to admit Agent Kelly's interpretation of Fratus' remark about exercising his First Amendment rights.  Federal Rule of Evidence 701 permits a lay witness to offer an opinion if it is rationally based on his perception, helpful to the jury, and not based on scientific, technical, or other specialized knowledge.  Because "personal interaction is nuanced and nonliteral," it is often useful to hear what one participant in a conversation understood the other to be saying.  *United States v. Stadtmauer*, 620 F.3d 238, 265 n.32 (3d Cir. 2010) (quoting Mueller & Kirkpatrick, *Federal Evidence* § 7:5, at 775).  Therefore, a witness may testify about the "context and meaning of conversations to which he was a party," including his "understanding of the thoughts that were being communicated to him."  *Id.* (quoting *United States v. Kozinski*, 16 F.3d 795, 809 (7th Cir.1994)).

Kelly has worked as an FBI Special Agent for more than twenty-five years.  (Trial Tr., Vol. II, 31:4–8.)  He testified that in his experience, hypothetical remarks like the one Fratus made were "usually . . . some kind of admission."  (*Id.* at 39:24–40:1.)

8

He drew on his own perceptions to conclude Fratus was being "deceptive and disingenuous," and his opinion was helpful to the jury, who otherwise might not have understood that when Fratus used hypotheticals to "skirt[] around the issue," he meant something other than what he actually said. (*Id.* at 41:16–18.)

Even if Kelly's opinion should not have been admitted, the error was harmless. Kelly testified that later in the same conversation, Fratus admitted he sent the emails to Commissioner Outlaw. (*Id.* at 42:5–25.) That explicit confession made the meaning of the hypothetical far less significant. No rational juror would disbelieve Kelly's testimony that Fratus explicitly confessed to sending the emails while still crediting his interpretation of Fratus' hypothetical.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.
